Morning, may it please the court. I am Edward Mitchell for Appellant Warren Dean Mako. And with me today is Jeffrey Nevin, who also has appeared in this appeal and was involved in the trial in the district court proceedings. Your Honors, with the with the recent decision of Premiano v. Cook, as to which we Setting aside the Daubert opinion itself, this court has now been asked on five occasions to review summary judgments that were entered after and upon the exclusion of expert testimony in the district court. And in all five instances, the exclusion of the expert testimony was determined to be an abuse of Those cases are set out in the briefs of both sides, but they are Maffei, Bigler, Balthewis, Taylor cited by the railroad and now Premiano. The case of the Premiano decision is significant because it's recently decided and because the Mr. Mitchell, your time is limited here. So let me tell you where I, my concern is, is that even if the Gill and Lee opinions should have been admitted by the district court, and that evidence should have come in, did that show that Burlington Northern breached its duty of care to this, or to the estate plaintiffs? Yes, Your Honor. How was that shown? Well, first of all, there isn't a lot of Washington law since the adoption of the restatement section by Memo with respect to the duty of a licensee. But first of all, I would point out that... Can I just back up one minute? Do you agree that this is licensee? No, we don't, Your Honor. And here's why. First of all, the district court made no determination that Donna Mako was a licensee. That's an argument that's been made by the railroad, but the district court did not make such a finding. Instead, the district court concluded that the basis for its summary judgment was that Ms. Mako had violated a statutory duty herself, the duty to yield. And this was the basis for the summary judgment. However, the statute on which the district court relied expressly says that the duty to yield only applies when an approaching train is plainly visible. So it was clearly erroneous to determine that there was a breach of duty when it's undisputed that the southbound Amtrak was not visible. And the statute is very clear on that. Well, now that gets to Ms. Mako's conduct and all. But what about the breach by Burlington Northern? What did they do wrong that caused this accident? Well, first of all, they knew that they had a dangerous condition on the land. And under the restatement, they have a duty to either correct a dangerous condition, even as to a licensee, or to warn about it. And there's ample evidence in the record that they knew that this condition was dangerous. For example, the interaction with neighbors with respect to problems with the crossing, the statements of Mr. Deck, the statement from the expert witnesses, assuming that the expert testimony was in, that the railroad would have known and should have known because of ample studies and literature done in the context of federal litigation, federal regulation of railroads, would have known that this condition was dangerous. And the condition to which I refer is a bidirectional crossing without gates or lights, where you have multiple trains moving in both directions and at varying speeds, with nothing to prevent the driver from going across. And if the court looks at the photographs that are in the record, it's very easy to see how a driver at that crossing, even looking to the north. That would be to the Mecco's right? Exactly. To Mecco's right. You have a very slow moving, very long Union Pacific freight train moving to her right, northbound. You have a very fast moving Amtrak passenger train moving to the south behind that. And as Dr. Gill has said, the variation in the speeds, coupled with the screening effect of the freight train in front of, from the driver's perspective, the southbound passenger train would require Ms. Mecco sitting at the with the crossing straight ahead clear, that is after the last clearance by the last car of the Union Pacific freight, before she could actually safely cross. Because as the freight moves north, it screens the Amtrak further and further in its southerly course. Yeah, but as the northbound train, the freight train clears the intersection, if you will, then it appears clear. It appears clear to the driver, but it's not safe. It's not safe. No. But had the driver looked up to the right, it still would have been clear because the freight train kept going and you couldn't see far enough. Isn't that about it? That is it. Well, what would have been clear was that you couldn't see. You couldn't see. So... It would have appeared clear, but there would have been a fast moving southbound train that would have hit you if you went forward. I think Judge Thompson's point is that it wouldn't have appeared clear. It would have appeared that there was a train in the way of any other train that you might be trying to see. Right? In other words... Oh, I see the distinction you're drawing. Yes, she would see the northbound freight train, unquestionably. What she would not see, which would have been past her, what she would not see is the train approaching her, which is what gives rise to the duty to yield under the statute. It's the approaching train, not a train. It must be an approaching train. Well, I bet the fact that you can't know whether there's an approaching train. In other words, she should have known that she couldn't have known whether there was an approaching train. Well, Dr. Gill, and this is why human factors engineering is so important here, Dr. Gill said, no, an average driver would think that the road ahead was clear. Well, why would that be? I mean, first of all, she wasn't really an average driver because she did this every day, two to six times, right? And she knew about the problem, which is relevant to the licensee standard, but she knew about the problem. We know she knew about the problem, right? We do, Your Honor, but I'd like to come back to that because she did not know the whole problem and she did not appreciate the actual risk that caused her death, which is what's required under the restatement and under the Tin Canny case. Under the Tin Canny case, it is not enough to know that you are confronting a hazard. There must be full appreciation of the specific risk. That's what lets the landowner off the hook. The risk is that there is somebody that you cannot see behind a train that has already crossed the intersection and there might be another train coming behind it faster than, which would reach the intersection before, after you did. That's the risk that Dr. Gill says the average motorist would not know. Even someone, Ms. Mako, would not know that if you had a high-speed passenger train screened by the freight, you would not realize because of the screening effect of the freight moving in one direction and a much faster train moving south, you would not realize intuitively or through common sense or through the exercise of reason, that you had to wait this long in order to avoid being killed. He says, in his experience, no motorist is going to sit there looking at an open crossing straight ahead for 13 seconds before thinking they have a reason to think that they can proceed safely across. That's what this whole conflict is about. The railroad basically takes the position that the train and the car arrived at exactly the same time and everything was visible to everybody. But Engineer Clickman testified in his deposition, and this is also evidence of the fact that the railroad knew of this hazard, of this condition, that coming south in the crossing and he decided to sound the horn even though he didn't have any duty because he was concerned that somebody might be there. Well, his testimony also, of course, is that she actually skirted around the end of the freight train. She moved to another lane. So it doesn't sound like she waited 13 seconds or 8 seconds or 5 seconds. That's his testimony, but he doesn't say that he actually saw that. He believes that that's what happened. But that's the conflict, Your Honor, in this case and why these experts, you know, we have a situation. If there had been no freight. No freight? Yeah. The thrust of what you're saying seems to me to say that if a motorist doesn't understand that a train that's 13 seconds away can hit it if it tries to cross, it still would be the railroad's fault. In other words, somebody looks up there and says, well, I can get across. There is a train coming. I can get across. No. And miscalculates. But it's a miscalculation here as to how much clear track she has to have to cross. It's not our position that a non-coming train incessant speed would be absolved of responsibility. This situation is, and by the way, like Tinkani, we believe this is a comparative negligence case with, you know, little factual disputes, but this is a situation where you can't see the train that's going to hit you and you don't know how fast it's going. I guess to come back to the beginning, what framework are we applying here? You said the judge, it's true, I guess, doesn't, if it appears to me he's applying the licensee standard because he starts with the first prong of it and he says there was no unreasonable risk of danger and that's why he never gets to anything else. But you say, sorry, you say you're not accepting that basic framework. So what framework do you argue for? It's a triable issue, Your Honor. No, what's a triable issue? I want to know what standard we're applying. Is she a licensee? Is she an invitee? Is this just a general duty of care to the public at large? What is it? What set of factors are we looking at? I understand, Your Honor, but I hope I'm being responsive. But our position is that under Tinkani, that whole issue was submitted to the jury and it should be submitted to the jury. What would the criteria be that you would submit it to the jury? One of the questions that are in dispute with regard to that, what was her position vis-à-vis Burlington Northens that set up what the basic duty of care is. Is that in dispute? I mean, we know that there's a road, a county road, and it ends and there's a sign saying it ends and then there's a railroad track, which I guess is a, I guess Burlington North owns the right-of-way. I don't know if we know that. Yes, that's correct. And then after that, there's a private road, which I guess is private to the community that Ms. Manko lived in, so she seems to have some role in that private road. So why isn't that enough to know to define the framework as opposed to how it comes out? I mean, how does that not establish that the plaintiff is in fact a licensee as opposed to something else? She's a licensee, she's an invitee or some other standard applies, but what else do we need to know to know that? Well, the reason is that this is a very different case from the cases in Washington that define licensee status. And in fact, there is no clear rule on this. Well, fine. Whatever the rule is, it's a legal rule and we can figure it out now. Why not? What is it we need to know to figure it out that we don't know now? We don't know what a jury would say about her status based on the fact that this was not a situation that the crossings are maintained for mutual benefit. They're not just maintained for the driver's benefit. They contribute to the success of the business of the  So let's say that's undisputed too. All the underlying facts are undisputed as to this question. So why are we sending to the jury? Well, I don't know that they're all undisputed because they really weren't litigated. The issue of the status of the plaintiff was not decided in the trial court and we didn't believe it should be. What difference would it make? Suppose she was an invitee rather than a licensee. Well, it would make it easier for her to establish her burden of proof, but we believe we have shown under Tincani the liability of the railroad under the licensee's status because of their knowledge of the hazardous condition and because of the fact that in Tincani and Tincani says it depends on whether the licensee knew or had reason to know the full extent of the risk posed by the condition. The full extent of the risk. And it says this is a question of fact. So between the testimony of Drs. Gill and Lee, it's quite clear that their opinion is that she did not appreciate this risk and that the average careful motorist would not appreciate this risk under these circumstances. But it's an unusual case in the amount of evidence of her knowledge of the condition. She's crossed this how many times a day for years? But there's no evidence, Your Honor, that she had ever crossed it under these circumstances. And this is why it's dangerous. It's dangerous because of the circumstances that existed at the time this accident occurred. No one disputes that she knew that there was a crossing and that any crossing is a hazard. And she knows it's a double crossing. And they've talked about the fact that another train can be coming the other way. It's unusual evidence. Yeah, that's been discussed. The train goes by, there may be one coming the other way. But what the testimony of the experts is, is that the average careful motorist would not know just how long they had to wait. In other words, she's sitting there watching the Union Pacific amble away to her right. It's ambling at 55 miles an hour, I think. About 45. And it's moved well past so that she has a view to her right and across both tracks. According to Dr. Gill, she would have had to sit there for 13 seconds after the road looked clear before she could have crossed that crossing without getting hit. And it may be that somebody in general wouldn't do that, but somebody who knows about this problem and has been told and agreed that she needs to sit there until she actually knows that there's no train behind there. But what the evidence does not support, Your Honor, is the assertion that she knew what Dr. Gill believes she did not know and had no reason to know, which is just how long. In other words, no one's contesting that a railroad crossing is a matter of time. But this is what I have a problem with. Why is it a time question? Why isn't the answer to the question is, when I can see that the train has gone so far that there is no question that there is no train behind it? Because, Your Honor, what Dr. Gill says is, that is not a common sense question. And that's how the trial court erred, by saying it was a common sense question. This is not obfuscation, Your Honor. This is actually, it actually is the case that your intuition is telling you that the road is clear. You're a careful person. You're not on a suicide mission. You're not a pathological risk taker. You are eager to live. You have your daughter in the car. You have two of your daughter's friends in the car. You've crossed this many times, which cuts both ways, because it also means... Anyway, you're well out of time. But thank you very much for your argument. Thank you. It sounds like the train out there. Okay. May it please the Court, I'm Tim Wackerbarth. I represent the Appalooie BNSF Railway Company. I'd like to just follow up on a request of counsel. And I think the questions of the panel have been right on in the sense that it's not a question of time. No one is saying that Ms. Mako had to sit there with a calculator and figure out how much time she had to wait until the view was clear. Her duty as a motorist was not to proceed until she could do so safely. And in fulfillment of that duty, she had an obligation to wait until the way was clear. I don't understand why her duty as a motorist has to do with this. Do you think we're proceeding under the licensee standard? Yes. All right. So isn't the key factor what she knew or should have known? And the duty thing is extremely vague. And if we were dealing with duties in general and not with somebody who crossed us every day, I think the answer could be different. I mean, I think Burlington Northern may well have a problem with regard to people who just happen to be visiting somebody across this road. But she did it every day. So I don't understand what the general duty has to do with it. You're correct, Your Honor, in that she did do this every day. And it is a licensee standard. And as you noted during questioning earlier, Judge Burgess, while he didn't specifically say that he was applying the licensee standard, there was no other standard that was advanced to him at the trial court level. He addressed the elements of the licensee standard. He really only had to reach the first element as to the scope of the danger involved. But I do think that this 13 seconds is somewhat of a red herring in that she had to wait however long it took in order to have a clear view of both sets of So we know from the record and from the experts that whether you can see the second track, is it possible to have a clear view of that track? Yes, straight tangent track, 3,500 feet to the north. It's a situation where she and her husband had discussed the possibility and, in fact, the likelihood that they were A clear view of being to the horizon or to what? 3,500 feet. You could call it the horizon. It's to where there's nothing visible. The tracks basically tend to come together in the distance. It's a wooded area. There's trees in the distance and nothing can be seen beyond that. As the panel is aware from our The nature of this crossing has been in existence since 1972. The FRA, Federal Railway Administration, has estimated the train count at 65, or 60 trains per day, 65 vehicles per day. There's only been one previous incident of this crossing. That was in 1986. Involved property damage only. An eastbound motorist drove his truck into the side of a slow-moving train. There's been no other fatalities, no other incidents remotely similar to this one. It's one of 9,000 or so private crossings that Burlington Northern has throughout its system. It's on double mainland. Private crossing, meaning that there's not a public road on both sides, so the public entity isn't responsible for it. Is that why it's a private crossing? That's correct, Your Honor. The county road ends to the east of this How many of those 9,000 are dual track? It's not in the record, Your Honor, as to how many are. I would just say the majority of them are. There are a number that are not on mainline track. But mainline track represents the main north-south corridor between Seattle and Portland, which is what this was on. It's mainline track basically from Seattle to the Portland area. Double mainline track. And less than 2% have the gates and lights that Dr. Gill and Dr. Lee opine here. If I could just make a few remarks about the Daubert issue here. Judge Burgess did exclude Drs. Gill and Lee from testifying. It's an abuse of discretion standard. Plaintiff appears to concede that if their experts cannot testify, there are no issues of fact here. Judge Burgess is not to be reversed on this decision unless his decision was manifestly erroneous with regard to both But is the standard at summary judgment whether it would be helpful to him or whether it would be helpful to a jury with a case tried? I think under the law it's whether it would be helpful to the trier of fact. Right. And didn't he apply a different standard? Didn't he say it's not helping me? He referenced that he didn't find them helpful. And the reason why he didn't find them helpful, Your Honor, is that neither Dr. Gill or Dr. Lee had any prior experience with evaluating railroad crossings and the issue of lights and gates. Neither could recall any research peer-reviewed article or publication that addressed the relative safety of crossings. I thought as to one of them, all that was said was he didn't have any experience as to double track. It was said in a very specific way. It didn't say he didn't have any experience with railroads. It said he didn't have any experience with double track crossings like this one. Is that right? I think he did make that, Judge Burgess did make that response. That's different from saying he didn't have any. I mean, if you make anything narrow enough, no one's going to have experience. There were a number of other areas where he had issues with their qualifications, though, and the lack of any peer-reviewed publications or studies on which they relied. And I think significantly, neither addressed any recognized standard or regulation, such as the Manual on Uniform Traffic Control Devices, the Policy on Geometric Design of Highways and Streets, which is the AASHTO publication, or the Rail Highway Grade Crossing Manual, all of which have certain criteria under which additional warning devices, such as gates and lights, might be recommended. It's not a requirement that they might be recommended. And that has to do with the sight distance, which in this case is over 3,500 feet. The recommended sight distance is 1,500 feet. The accident history, the speed of trains, none of which Dr. Gill or Dr. Lee even referenced or sought to apply in this case. I found it significant also that neither of these experts had a deposition testimony of the one and only eyewitness to this case, who was Robert Clickman, the Amtrak engineer. When I asked Dr. Lee in his deposition what studies or tests he was relying on, he said he could not point to any, but he was relying on the wisdom of the jury. That's at page 728 and 729 of the record. It appears that he was putting the gatekeeping function of Judge Burgess. The overall record indicates that Judge Burgess did properly exclude these experts under Daubert. But I would also point out that even with these opinions, and this goes to our earlier discussion, I believe DNSF is still entitled to summary judgment. It is a case about the right-of-way. It's undisputed that we have the right-of-way at this location. It's also undisputed that Don Emako had the duty that I referenced earlier to yield oncoming train traffic and not to cross until she could do so safely. Judge, tell me exactly where you think that consideration fits into the analysis. This is a comparative negligence state. Where does that fit into the analysis? I think it fits in on proximate cause. As Judge Burgess found, the sole proximate cause of this incident was the conduct of Don Emako. It makes her the sole cause? The sole proximate cause, yes. Why does the fact that what duty she had explain the cause? It explains her duty, but it doesn't explain the cause. It goes to the breach of her duty as a motorist. Right. It doesn't go to the cause. The sole proximate cause. But so it goes to her negligence. But this is comparative negligence. So I don't understand how it helps in telling us whether Burlington Northern was also in some respect negligent. I don't understand the relevance of it. Well, we dispute that there's any evidence of our... And that's what I want to hear. But I don't see a relevance at this stage of whether she breached her duty herself. Well, in that instance, I just point to what I referenced earlier about the lack of any accident history here, the adequate sight lines in both directions. There's been no issue raised about the crossing surface. It was a smooth crossing surface. There was a stop sign in place. In light of all that, I don't find any evidence at this point. Suppose this was not a private crossing. Okay. And there was no gate or flashing lights or anything else. Would that not be unreasonably dangerous for a breach of duty to the public? The evidence is that this was a private crossing of Judge Bernice's area. I understand that. But I'm just trying to understand why exactly. You're saying that this essentially... You're really saying it wasn't dangerous. But I find it hard to believe that if this wasn't... If there were a public road on both sides, that at least the municipality, if not the railroad, that somebody would have been responsible for more warnings that went on here. If it's a public crossing, there are standards that would apply here. They did not necessarily require gates or lights. There might have been some additional signage that might have been required. So why is it different when the railroad knows that there are a substantial number of people crossing that road every day and are allowed to do it? Why is it different if it's a public or a private crossing with regard to what's necessary to protect people from danger? I'm not sure that it is treated differently, necessarily, in that sense. Two percent of BNSFs, private crossings, have gates and lights. That's situations where you have permanent obstruction of some kind, limited sight distance. But if it were public, is there any chance that there would be not perceived to be a problem if this was the circumstance and there was no warning of any kind? Well, there is a warning in the sense that there's an advanced railroad warning sign. There's a stop sign. There's a warning that it's a railroad. There's nothing under the criteria that I'm aware of, Your Honor, that even if this was a public crossing would have required gates and lights. You basically have 800,000 or so motorists over the course of the history of this crossing who safely negotiated the crossing without incident. The accident history is .99987, I believe. It was set out in our brief. Okay. You don't have to use all your time. I don't have anything for you, Your Honor. Thank you very much. You've used your time. I guess we will give you 30 seconds or so if there's something you're dying to say. Thank you very much, Your Honor. I appreciate that. With respect to the qualifications, Dr. Lee has been hired, as the record indicates, by Burlington and Northern as an expert in crossing litigation. So it's somewhat surprising to hear his credentials questioned here. The record does not establish the gaps in the work that they did or the qualifications as described by the railroad. There is much literature cited in the deposition of Mr. Gill right at the pages where it is cited in the briefs that he did not refer to literature or knew of no literature. And so there was not a gap with respect to the Daubert factors. Can I ask you one question? Yes. Is there any case law on public crossings that are similar to this? Is there any case law about railroad crossings that we ought to be looking at? I haven't seen anything cited really. Your Honor, I know of none in Washington. And there is an annotation that just came to my attention last night, an ALR annotation, that I can provide to the Court, if you would like, that is quite recent on railroad crossing litigation. Okay. Thank you very much. Thank you to both counsel for a useful argument. The case of Macko v. Burlington-Northern is submitted.
judges: Canby, Thompson, Berzon